[No. 28465. *En Banc.* November 28, 1941.]

HARRY PILLATOS, *Respondent*, v. SAMUEL HYDE *et al.*, *Appellants.*[1]

[1]Reported in 119 P. (2d) 323.

*Tyre H. Hollander,* for appellants.

*Padden & Moriarty* and *Melvin T. Swanson,* for respondent.

MILLARD, J.—This action was instituted to recover wages alleged to be due for labor performed for defendants by plaintiff in a coal mine in King county. Trial of the cause to the court resulted in findings of fact and judgment in favor of plaintiff. Defendants appealed.

The facts are as follows: Samuel Hyde, who later organized a domestic corporation (Hyde Mines, Inc.) for exploitation of a coal mine in King county, employed respondent September 15, 1938, as a laborer in that mine which Hyde then held under option for lease. October 15, 1938, which was prior to the incorporation of the coal mine, Samuel Hyde entered into a written agreement, reading as follows, with respondent under which respondent obligated himself to receive one-half of his compensation in cash and to leave the remainder of his compensation on deposit with Hyde for the purpose of developing the coal mine in question; and, if the property were later incorporated, respondent agreed to subscribe for stock in that corporation and pay par value therefor to the amount of one-half of his wages, left on deposit with Hyde:

"For and in consideration of the sum of One Dollar ($1.00), to me in hand paid, the receipt whereof is hereby acknowledged, I do hereby agree to and with SAMUEL HYDE, of the City of Seattle, King County, Washington, as follows:

"FIRST: That I have been and will continue to be in the employ of said Samuel Hyde, in the opening and developing of a coal mine in Section 29, Township

21, North Range 7, E.W.M., in King County, Washington, and I agree as follows:

"SECOND: To receive one-half of my compensation in cash and to leave the balance of my compensation on deposit with Samuel Hyde, for the purpose of open-. ing up and developing a coal mine in the property hereinafter described, and if and when he incorporates a corporation to operate a coal mine in Section 29, Township 21, North Range 7, East W.M., I agree to subscribe for stock in said corporation to be formed, and pay par value therefor to the amount of one-half of my compensation or wages, which I have left on deposit with said Samuel Hyde.

"THIRD: If, however, it shall develop, that in the opinion of Samuel Hyde, it should not be advisable to open up said coal mine on said property and he shall abandon the same for any reason, then in such an event, I agree to waive, charge off and loose the money so left by me with him on deposit for the purpose of purchasing said stock, it being my intention to contribute one-half of my income or my salary, that shall be coming to me as aforesaid from said Samuel Hyde towards the opening and development of said coal mine.

"DATED this 15th day of October, 1938.

(Signed) HARRY PILLATOS

"In the event a satisfactory showing should be made in the coal mine I am now opening up, or causing to be opened up in Section 29, Township 21, North Range 7, E.W.M., in King County, Washington, I agree to incorporate said mine and to give to $500.00, stock at par value to the amount of his salary that he has left with me for the purpose of developing said mine and to purchase stock therein, in the event it should develop in my opinion that said coal mine is of sufficient value to incorporate. (Signed) SAMUEL HYDE"

July, 1939, Hyde and others incorporated the mine for fifty thousand dollars. By September 15, 1939, respondent had on deposit with the company, according to its books, five hundred dollars, which represented one-half of his earnings and entitled him to five hundred shares of stock of the company. December 31,

1939, according to the company's books, respondent had on deposit one-half of his earnings for the remainder of 1939 which entitled him to one hundred and twenty-eight shares of stock of the company. Respondent was discharged April 30, 1940, because the mining company no longer needed his services. March 12, 1940, appellant company issued in the name of respondent certificate No. 6 for five hundred shares and certificate No. 12 for one hundred and twenty-eight shares of its stock, but did not then deliver the shares to him. May 8, 1940 (when respondent voluntarily or involuntarily ceased to work for the company), those certificates, together with a check in the amount of $23.30 for his wages, were handed to respondent, who objected to acceptance of the shares of stock in payment of his wages. His request that he be given cash for the shares of stock was answered by Hyde to the effect that the stock was not worth its face value then; that the company did not wish to redeem it; and that respondent would have to sell it the same as others were doing. That same day respondent called on his present attorneys, who returned the stock certificates and check to appellant Hyde and demanded that respondent be paid in money as required by Rem. Rev. Stat., § 7594 [P. C. § 3548] *et seq.* The demand was refused, whereupon respondent commenced this action, which resulted as recited above.

The pertinent portion of the applicable statute reads as follows:

"It shall not be lawful for any corporation, person or firm engaged in . . . mining, . . . or any business or enterprise of whatsoever kind in this state, to issue, pay out or circulate for payment of wages of any labor, any order, check, memorandum, token or evidence of indebtedness, payable in whole or in part otherwise than in lawful money of the United States, unless the same is negotiable and redeemable at its face value, without discount, in cash or on demand,

at the store or other place of business of such firm, person, or corporation when the same is issued, and the person who, or company which may issue any such order, check, memorandum, token or other evidence of indebtedness shall upon presentation and demand redeem the same in lawful money of the United States. And *when any laborer* performing work or labor as above *shall cease to work* whether by discharge or by voluntary withdrawal the *wages due shall be forthwith paid* either *in cash or* by *order redeemable in cash at its face value* on presentment at bank, store, commissary, or other place in the county where the labor was performed: . . . " (Italics ours.) Rem. Rev. Stat., § 7594 [P. C. § 3548].

■ The statute plainly prohibits any person or corporation, engaged in any business or enterprise of whatsoever kind within this state from paying to any laborer who shall cease to work for such person or corporation the wages due in anything other than lawful money of the United States, or by an order or check payable in lawful money of the United States in the county where the labor was performed.

The contract in the case at bar comes within the ban of Rem. Rev. Stat., § 7594, which declares a rule of public policy in this state designed to protect wage earners who are employed in certain industries; and where an employer and his or its employee attempt to make a contract of employment in violation of the clearly expressed provision of the statute, the natural right of the employer and the employee to contract between themselves must, as stated in *Burdette v. Broadview Dairy Co.*, 123 Wash. 158, 212 Pac. 181, yield to what the legislature has established as the law. The statute is mandatory that wages be paid forthwith, on ceasing work, in lawful money of the United States or by order or check redeemable in cash at its face value in the county where the labor was performed.

An apt authority is *Hancock v. Yaden,* 121 Ind. 366, 23 N. E. 253, 6 L. R. A. 576. The Indiana statute requires that wages be paid in lawful money of United States. In an ·action by the plaintiff for value of services rendered in the coal mines of the defendants, the answer admitted the employment and services rendered, but pleaded as a defense the existence of a contract antecedent to the employment, whereby the plaintiff expressly waived his right to demand and receive his wages and pay for mining coal in lawful money of the United States. The court held that the antecedent contract was void in so far as it assumed to waive the· plaintiff's right to receive his wages in money.

In principle, the case cited and the case at bar are indistinguishable. Respondent Pillatos agreed to accept shares of stock for a portion of his wages, or, in other words, to waive his right to demand and receive a part of his wages for mining coal in lawful money of the United States when he voluntarily or involuntarily ceased to work for appellants. That antecedent contract was illegal and void, as it was in contravention of the public policy of this state declared by the legislature in Rem. Rev. Stat., § 7594.

Appellants assign as error the entry of a judgment against Samuel Hyde and Rachel Hyde, his wife, individually. It is contended that legally respondent was never in the employ of Samuel Hyde.

The action was brought against Samuel Hyde and Jane Doe (Rachel) Hyde, his wife, and Hyde Mines, Inc., a corporation. Judgment was entered against "the defendants for the sum of $628, and for plaintiff's costs and disbursements." Prior to employment of respondent by the corporation—presumably in July, 1939, when the mine was incorporated—he was an employee of Hyde, with whom he made the contract

which is before us on this appeal. The judgment is not entered against Samuel Hyde and wife individually, but only against the "defendants." The judgment is, in effect, against Samuel Hyde and Rachel Hyde, a marital community, and Hyde Mines, Inc., a corporation.

Appellant wife is bound by the acts of her husband, but she is not bound individually. The mining venture in which Samuel Hyde was engaged was a community venture, as he and Rachel Hyde were husband and wife. The unpaid compensation of respondent for the period from September, 1938, to July, 1939, when respondent was an employee of Samuel Hyde, is an obligation of the marital community of Samuel Hyde and Rachel Hyde. That portion of unpaid compensation due to respondent for services performed for the mining corporation from July, 1939, to April 30, 1940, is an obligation of the corporation, a legal entity separate and apart from its stockholders.

The judgment is reversed and the cause remanded, with direction to the trial court to determine the amount of compensation the marital community and the corporation, respectively, owe to respondent and to enter judgment accordingly. Respondent will recover costs in this court.

Main, Beals, Blake, and Driver, JJ., concur.

Steinert, J. (dissenting)—The only question involved in this appeal is the proper construction of Rem. Rev. Stat., § 7594 [P. C. § 3548]. That section consists of two distinct parts. The first part was enacted by the territorial legislature of 1888 and reads as follows:

"Section 1. That it shall not be lawful for any corporation, person or firm engaged in manufacturing of any kind in this Territory [changed to 'State' in Laws of 1905, p. 219, § 1], mining, railroading, constructing railroads, or any business or enterprise of whatsoever

kind in this Territory [changed to 'State' in Laws of 1905], to issue, pay out or circulate for payment of *wages* of any labor, *any order, check, memorandum, token or evidence of indebtedness,* payable in whole or in part otherwise than in lawful money of the United States, unless the same is negotiable and redeemable at its face value, without discount, in cash or [on] demand, at the store or other place of business of such firm, person or corporation when the same issued, and the person who, or company which may issue any such *order, check, memorandum, token or other evidence of indebtedness* shall upon presentation and demand redeem the same in lawful money of the United States." (Italics mine.) Laws of 1888, p. 234, § 1.

By § 2 of that act, any violation of the provisions of § 1 was made a penal offense.

In 1905, our state legislature reenacted § 1 of the act of 1888, quoted above, and added thereto the second part of what is now Rem. Rev. Stat., § 7594, reading as follows:

"And when any laborer performing work or labor as above shall cease to work whether by discharge or by voluntary withdrawal *the wages due* shall be forthwith paid either in cash or by order redeemable in cash at its face value on presentment at bank, store, commissary, or other place in the county where the labor was performed." (Italics mine.) Laws of 1905, p. 219, § 1.

In *Smaby v. Shrauger,* 9 Wn. (2d) 691, 116 P. (2d) 967, the decisions bearing upon the two parts of Rem. Rev. Stat., § 7594, were reviewed, and the reasons for the adoption of the statute were stated by quoting from our earlier cases. For instance, in *Shortall v. Puget Sound Bridge & Dredging Co.,* 45 Wash. 290, 88 Pac. 212, 122 Am. St. 899, Judge Fullerton, speaking for the court, said:

"But we think the practice, pursued by certain employers of labor, of paying the wages of their em-

ployees in orders drawn upon stores redeemable in commodities other than lawful money of the United States, and of postponing the day of payment until long after the wages were earned, was a real evil, operating to the detriment of the wage earner, and consequently to the detriment of the state. *As such the practices* were subject to correction by the legislature, and its act in *that regard* was well within the rules of sound public policy." (Italics mine.)

Again, in *State v. Chehalis Furniture & Mfg. Co.*, 47 Wash. 378, 92 Pac. 277, Judge Dunbar, writing the opinion, said with reference to the first part of the statute:

"The evident intention of the legislature in passing this law [the original act of 1888] was to prohibit the pernicious habit which had theretofore frequently been indulged in by factories of different kinds of paying the laborers in checks which were only redeemable in goods which were to be furnished by the company stores."

Also, with reference to the second part of the statute (added in 1905), Judge Dunbar said:

"The object of this statute was to protect the laborer from the necessity of remaining around in the neighborhood where he had been employed, and waiting on expense the payment of wages which he had already earned."

It will thus be seen that the statute had a direct, definite, but limited, two-fold purpose: (1) to put an end to the issuance of orders, or checks, drawn upon the employer's company store and redeemable only in commodities rather than in lawful money, and (2) to terminate the practice of postponing the day of payment of wages to a time long after the wages were earned and thus subjecting the laborer to delay and expense in the collection of what was owing to him.

None of the practices or evils pointed out in those cases is in any sense involved here. Respondent was

not given an order or any similar writing redeemable only in merchandise at a store, nor is there any question of delay in paying respondent the amount conceded to be owing him for wages earned.

The question in this case, as I see it, is simply whether or not it is against public policy to permit an employer and his employee to enter voluntarily into a contract whereby they agree that the employee will purchase stock in a corporation formed or to be formed by the employer and will apply a portion of the agreed amount of his wages to such purchase. In the absence of any mistake, fraud, or coercion, I see no reason why freedom of contract in that respect should be forbidden or restricted, nor why the statute should be construed to have that effect. It is true, of course, that the stock thus purchased may ultimately prove to be of less value than the amount paid therefor. On the other hand, the same stock may prove to be worth considerably more than its purchase price. Is the laborer nevertheless to be deprived of the right to invest a part of his earnings in the stock of the company for which he works merely because he elects to have a part of such earnings retained by his employer and applied upon the purchase of the stock?

Suppose, in this case, that the parties had made two contemporaneous agreements, one covering merely the amount of the wages to be paid for work performed by respondent, and the other covering a subscription for stock by respondent. Both agreements, I think, would be valid. The payment by the employer of the wages earned by the employee would satisfy the first contract, and the second could be enforced, either by the company on its demand of the amount owing on the stock, or by the workman on his demand of stock equivalent to the amount paid by him. If such an arrangement can be effected by the execution of two

separate, but contemporaneous, agreements, why can it not be encompassed in one? The purpose and the result are exactly the same in both instances. The legal effect of the contract involved here is that appellants, or one of them, employed respondent at a fixed wage per day, and respondent in turn agreed to purchase a certain amount of stock to be paid for out of his accrued earnings.

The contract in this instance does not violate the prohibitive provisions of the first part of the statute, either in letter or in spirit, because appellants did not issue, pay out, or circulate for payment of wages "an order, check, memorandum, token or evidence of indebtedness." What appellants did was to issue stock in return for the money which respondent had left with them for that very purpose. Nor does the contract violate the mandatory provisions of the second part of the statute, because, when respondent quit work, no *wages* were due him, except a balance of $23.30, which he then received. All that he was entitled to have delivered to him at that time was the stock for which he had paid. In short, this is not at all a case where a laborer to whom *wages* are due is given an order, check, or some other evidence of *indebtedness* payable otherwise than in lawful money, or where *wages* due and owing the laborer are withheld for payment as such at some postponed date. It is simply a case where a laborer has been paid in full, partly in cash and partly by satisfying a lawful debt which he has contracted.

The purchase of stock by respondent from appellants is in the same category as the purchase by him from appellants of gas, coal, and tires, which in fact he did purchase and for which the court allowed an equivalent deduction from his wages. If the majority

414

opinion herein be correct, then appellants could have been required to pay the full amount of the wages earned by respondent regardless of the amount owing by respondent for the gas, coal, and tires. Indeed, no merchant could safely extend credit to his employee, expecting to have the bill paid out of the employee's weekly or monthly salary or wage, for, under the interpretation given to the statute by the majority opinion, the employer must pay the employee every week, or every month, the full amount of his periodic salary or wage, and then collect his account as best he can. Further, under that interpretation, the employer and employee could not make a valid agreement authorizing the employer to pay, out of the employee's earnings, designated obligations owing by the latter to third parties, and if the employer should assume to pay such obligations as directed he would nevertheless be liable to the employee for the full amount of the wages earned. The illustrations just employed would be as clearly within the letter of the statute as are the facts of this case. Yet I think that this court would hardly say that the illustrative cases come within the spirit or purview of Rem. Rev. Stat., § 7594.

The case of *Hancock v. Yaden,* 121 Ind. 366, 23 N. E. 253, upon which the majority opinion so strongly relies, is a perfect illustration of what the statute in Indiana, as well as the statute in this state, intended to prohibit. There, the contract between the employer and the employee read as follows:

"The said William P. Yaden further agrees to accept his pay, or any part thereof, at the option of said Hancock and Conkle, *in goods and merchandise at their store,* near their said coal mine, and the said William P. Yaden hereby *expressly waives his right to demand and receive his wages and pay* for mining coal every two weeks *in lawful money of the United States,* as now provided by law he shall be paid." (Italics mine.)

It was held in that case that the contract was invalid in so far as it assumed to waive the right of the employee to be paid his wages in money. That is not the situation here. Respondent did not waive his *right* to be paid in lawful money. What he did was to subscribe for stock, with direction to the employer to apply a certain portion of the lawful *money* earned by him to the payment of his stock subscription. In my opinion, there is no public policy against the making of such a contract, and the statute should not be construed to that effect.

To avoid any possible suspicion that respondent may have been induced to take stock in a doubtful venture, it is proper to say that no such suggestion appears in this case. The mine was in full operation, after an expenditure thereon by appellants of approximately forty-five thousand dollars. The trial judge himself said:

"There is no issue of overreaching or fraud involved in the case. There is no question involved in this case as to the position of some dominant mind upon some weak mind, giving him stock for his services in a fly-by-night proposition. There is none of that in the case, such as oftentimes is involved in cases of this kind where they sell stock, and a person has no chance to investigate as to the value of the stock and there is misrepresentation as to the value of the stock and all those cases; the books are full of those kind of cases. This is purely a matter, it seems to me, the Court will assume that the stock was not of that character, when no issue is raised by the plaintiff [respondent]. It is only a matter of statutory construction which enters into this case more than any other issue, that I can see up to the present time."

Upon that statement, incorporated into a ruling, the trial court refused to permit any evidence by appellants as to the solvency or character of the mine.

I am of the opinion that the contract between the

416

parties to this action did not come within either the prohibitory or the mandatory provisions of Rem. Rev. Stat., § 7594. I therefore dissent.

ROBINSON, C. J., SIMPSON, and JEFFERS, JJ., concur with STEINERT, J.

